PER CURIAM.
This appeal is from a final order of the Department of Health and Rehabilitative Services (HRS) which adopted in full the hearing officer’s recommended findings of fact and conclusions of law and ordered that appellant, James W. Gillies, be fined for failure to secure the necessary license for operation of an adult congregate living center. The issue presented on appeal is whether there is competent, substantial evidence to support HRS’s finding that Gillies is the “operator” of several adult congregate living centers and, as such, is required to be licensed pursuant to section 400.-407(l)(a). After thorough consideration of the parties’ arguments and review of the record on appeal, we find there is competent, substantial evidence to support the findings upon which the final order is based and discern no error or misapplication of the correct rule of law. The hearing officer’s recommended order adopted by HRS is well reasoned and is hereby adopted as the opinion of this court (see appendix).
AFFIRMED.
MILLS, J., ERVIN, C.J., and ZEHMER, J., concur.
APPENDIX
BACKGROUND INFORMATION
The Administrative Complaint in Case No. 83-336 versus Respondent Share-A-Homes of America, Inc. (SAH), was filed on January 6, 1983. An Answer and Request for Hearing was filed on January 21, 1983. On June 9, 1983, Respondent moved for a summary judgment which was denied by the Hearing Officer. Thereafter, Petitioner filed an Amended Administrative Complaint in this case on June 11, 1983, for which an Answer was filed by Respondent on June 22, 1983.
As to Case No. 83-2312 with Share-A-Concept, Inc. (SAC), and James W. Gillies as Respondents, the Administrative Complaint was filed on June 17, 1983/ and an Answer and Request for Hearing was filed on June 29, 1983. Thereafter, Petitioner filed a Motion to Consolidate both cases on August 24, 1983; and this motion was granted on September 7, 1983.
At the hearing, Petitioner presented the testimony of Respondent James W. Gillies, Karen 0. Tuttle, James Bonanno, Karen Martin and Hermie Sanders, as well as Petitioner’s Exhibits 1 through 9. Respon *1106 dents presented the testimony of Walter A. Willis, Eugene R. Amyx, Dorothy Shackle-ford, Willie C. Sullivan, Ruth Michelman and Jack Peterson, as well as calling Respondent Gillies to the stand, and introduced Respondents’ Exhibits A through C.
FINDINGS OF FACT
1. Respondents in this case are two corporations, Share-A-Homes of America, Inc., and Share-A-Concept, Inc., and an individual, James W. Gillies.
2. Both corporate Respondents are nonprofit corporations which have now been merged under the name Share-A-Concept, Inc.
3. Share-A-Concept, Inc., and its predecessor, Share-A-Homes of America, Inc., own or lease parcels of real estate in Orange County, Florida. These parcels of real estate consist of lots and homes built thereon. These homes are subsequently subleased by Respondent corporation (now Share-A-Concept) to the various Share-A-Homes associations for a rental equal to the rental or mortgage payment paid by SAC plus a surcharge of 1.5 percent. This surcharge is accumulated and used for start-up expenses for other Share-A-Home facilities and to meet the deficits occurring from time to time in existing Share-A-Homes associations.
4. The various Share-A-Homes associations are made up of the elderly residents of each home who live together in a homelike atmosphere and whose needs are provided for by a house manager who does the housekeeping, laundry, grocery shopping and cooking. Larger families may have additional staff, such as a maintenance man or a gardener.
5. Each resident of a Share-A-Home pays a sum each month into a communal bank account which is opened in the name of that particular Share-A-Homes association. The amount paid each month is set initially by the general manager, Respondent Gillies. Changes are made from time to time as necessary, pursuant to a house meeting called by either Mr. Gillies or home residents at which a proposed increase or decrease is announced, discussed and voted on by the residents. Each separate residence’s bank account is maintained by Respondent Gillies in his administrative office located in the Share-A-Home family residence located at 701 Driver Street in Winter Park, Florida.
6. Respondent Gillies is neither an officer nor director of Share-A-Concept or its predecessor corporation, Share-A-Homes. He is currently serving as executive director for Share-A-Concept without, pay. Among his duties are the setting up of various “homes” by locating a site, arranging for its rehabilitation and then serving as coordinator with various churches and civic leaders in order to attract residents into the facility. Respondent Gillies is paid to function as the general manager of all Share-A-Concept family homes by the individual homes. As such, he oversees the overall structure of the home, provides proper management training for the people who work there, oversees the financial management of all of the homes, signs checks for all of the homes, interviews prospective employees for all of the homes, insures the employees are properly trained and has discharge authority over these employees. He can be discharged by the residents of any given home.
7. Assisting him in his duties are Ruth Michelman and Rosalee Garnsy. Ms. Mi-chelman is a self-employed administrative contract worker for all seven Share-A-Home families. As such, she pays the bills out of the bank accounts of each family on which she is authorized to write checks (she maintains custody of all checkbooks), as are Mr. Gillies and Ms. Garnsy. The checks Ms. Michelman periodically receives from each family organization in payment for her services contain no deductions for withholding or Social Security.
8. Respondent Gillies has the decision-making authority as to what salary each employee of the individual homes is paid, but does not, he says, supervise them. By the same token,' he does not do the hands-on training, merely advising as to policy *1107 and concept. He contends the on-site managers at the various individual homes do the training and, he contends, he is not responsible for the day-to-day operation of the homes. It appears, however, that Respondent Gillies, Ms. Michelman and Ms. Garnsy in fact manage and run all the various homes operated under the Share-A-Home concept in Orange County. For example, if there is a major repair necessary, the various homes do not themselves arrange for the repair, but instead report the deficiency to Mr. Gillies or the “office,” which in turn arranges for repair either by an independent repairman or through Mr. Earl Jackson, the husband of the house manager at the Driver Street facility who was himself employed by Mr. Gillies as the maintenance man and chauffeur for that “home.” In fact, he has often been directed by Respondent Gillies to make repairs at other homes even though his paycheck is drawn on the account of the Driver Street home.
9. There are seven individual “homes” in the Orange County area. They are located at:
(1) 703 Greens Avenue, Winter Park — 6 residents;
(2) 701 Driver Street, Winter Park — 18 residents;
(3) 620 Driver Street, Winter Park — 7 residents;
(4) 3201 Minnesota Avenue, Winter Park —11 residents;
(5) 5329 Eggleston Avenue, Orlando — 8 residents;
(6) 5300 Satel Drive, Orlando — 10 residents; and
(7) 438 Plant Street, Orlando — 18 residents.
10. Residents enter the home when either the resident or his or her family member makes contact with either the office - operated by Respondent Gillies or one of the homes’ director. If there is an opening in one of the homes, it is looked at by the prospective resident and his or her family and, if satisfactory, the new resident moves in. Fees are ostensibly determined by a meeting of the family, and Respondent Gillies states he does not assist in the setting of fees. However, the testimony of residents indicate that though they think they have an active role in managing the individual homes and setting of fees, their participation generally takes the form of approving a “suggestion” made by Mr. Gillies or some other “independent contractor.” When the fees set by this process are paid, the payments are made either to the home manager or to the general office of the Respondent Gillies where a deposit is made to the individual home account. In either case, however, the checkbook for that home is maintained by Respondent Gillies; and he, Ms. Michelman and Ms. Garnsy are the only individuals who can write checks on the account.
11. When a resident enters one of the homes, there is no contract entered into between that resident and either the “family” which he or she will join or with Share-A-Concept, Inc. By the same token, there are no written agreements between the “families” and either Share-A-Homes formerly or Share-A-Concept now. There are, however, Articles of Association which govern each individual family. These Articles are basically identical for each home and were originally drawn up approximately 12 years ago by the first family organized under this concept.
12. Once the prospective resident enters the home, he or she has 30 days within which to make up his or her mind as to whether or not he or she wants to remain. Mr. Gillies indicates that if a resident, having once joined the association, fails to make a payment assessed by the “family” when due, Share-A-Concept, Inc., would not take action. The initial or individual family would do so. That responsibility has been delegated to Respondent Gillies, who, as the general manager, is the one who is to file the eviction notice.
13. There is no set fee for the residents of each home to pay. The actual amount paid depends upon income of the resident and other factors. Rent alone generally runs from $75 to $80 per month for each resident. For this, the resident gets food, *1108 laundry, transportation and a bed in what in most cases are double rooms in the home. Each resident must be ambulatory and able to take care of himself or herself. If the individual becomes incapacitated, he or she must leave, as no medical services are provided. In that regard, however, medicines prescribed by the individual resident's physician are made available to the patient by the staff members, who maintain control and custody of the medicines and who put them out for the patient to take himself or herself as required. Further, some house managers, though they are told not to administer medications, will assist individual residents in administering periodic injections of such things as insulin, etc.
14. Notwithstanding the representation of Respondent Gillies that the individual staff members at the residences may be hired and fired by the residents at that particular home, and while one resident testified that she felt she had at least some say-so in the management of the home to the extent at least of being able to give approval to proposals offered by Mr. Gillies and or his staff, other testimony by former employees of the various homes tends to indicate somewhat to the contrary. For example, both Karen Tuttle and James Bo-nanno were hired by Mr. Gillies, transferred by Mr. Gillies and ultimately discharged by Mr. Gillies. Ms. Tuttle stated she was discharged because Mr. Gillies felt the work was too hard and the drive too far for a pregnant woman (Ms. Tuttle was pregnant at the time). When she went back to visit the families afterward, they told her that they had been told she had quit, which in fact was not the case. Mr. Bonanno, who worked at two of the residences in question, and as supervisor of ten residences for a period of time, was hired by Mr. Gillies in that capacity. His duties included visiting all houses to see if all was well. He did some of the consolidated meat buying (the individual home managers purchased the majority of the groceries with checks drawn on that home’s account by someone at Mr. Gillies’ office); and if there was a problem in any of the homes, he would let Mr. Gillies know. During the time he was with this organization, he did not recall any family ever having a meeting (there is evidence that family meetings were held); and when he was ultimately discharged, that action was taken not by any of the families, but by Mr. Gillies, who stated that the homes could not afford him any more.
15. On balance, then, it becomes clear that while Share-A-Homes of America, Inc., and Share-A-Concept, Inc., appear to have no participation in the provision of services or the operation of the homes in question, Respondent Gillies in fact does. It is obvious from the above that Mr. Gillies and the two other individuals who work with him in the office, while employed under what appears to be an independent contractor relationship, are in fact the management team, headed by Respondent Gillies, for all the “homes” in this area which bear the title “Share-A-Home.”
CONCLUSIONS OF LAW
1. The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of this proceeding.
2. Respondents are charged with numerous instances of operating adult congregate living facilities without first obtaining a license in violation of Section 400.-407(1), Florida Statutes, and Rule 10A-5.-17, Florida Administrative Code.
3. Part II of Chapter 400, Florida Statutes (1981), deals with adult congregate living facilities; and it is this part of the referenced chapter under which Petitioner seeks to discipline Respondents. Section 400.402(2), Florida Statutes (1981), defines an adult congregate living facility as:
“Adult congregate living facility,” hereinafter referred to as “facility,” means any building or buildings, residence, private home, boarding home, home for the aged, or other place, whether operated for profit or not, which undertakes through its ownership or management to provide, for a period exceeding 24 hours, housing, food service, and one or more *1109 personal services for four or more adults, not related to the owner or operator by blood or marriage, who require such services. A facility offering personal services for fewer than four adults shall be within the meaning of this definition, if it formally or informally advertises to or solicits the public for residents or referrals and holds itself out to the public to be an establishment which regularly provides such services.
4. The evidence submitted at the hearing, as outlined above, clearly establishes .that the “homes” which Respondents classify as “families” fall within the definition of an adult congregate living facility as outlined in the statute. The buildings constitute homes for the aged not operated at a profit which undertake through their management to provide for a period in excess of 24 hours housing, food service and at least one additional personal service, such as laundry or chauffeur service for in each case more than four adults not related to the operator, Mr. Gillies, by blood or marriage, who require these services. Personal services are defined in Subparagraph (8) of this particular section; and clearly those functions provided for the residents through Mr. Gillies or those under his supervision fall within the purview of personal services.
5. Having established that the operation constitutes an adult congregate living facility as defined by the statute and the rule, the next question for resolution is which, if any, of the Respondents operate that facility. It is clear that Share-A-Homes of America, Inc., no longer operates any facilities. Its successor, Share-A-Con-eept, Inc., has as its executive director, albeit without pay, the Respondent James W. Gillies, who clearly, even though he is an independent contractor employed by the various homes, operates the homes for the residents notwithstanding their participation in the management of the individual facilities. It is clear, then, that Mr. Gillies does in fact operate the facilities.
6. As to Share-A-Coneept, Inc., however, there is insufficient evidence to tie the operation by Mr. Gillies to the organization of which he is executive director because his activities as they relate to the individual residences do not impact on Share-A-Concept, Inc. The sole connection that agency has with the individual homes is as landlord; and Mr. Gillies’ activities for the individual homes are not in his capacity as executive director of Share-A-Concept, Inc.
7. Therefore, it is clear that only Respondent Gillies is in violation of the statutes, which, at Section 400.407(1), make it unlawful to operate an adult congregate living facility without first procuring a license authorizing such operation. Having concluded that Mr. Gillies is in violation of that particular statutory provision, it can then be concluded legitimately that he falls within the purview of Section 400.419(l)(b), Florida Statutes, which provides that any operator found to be in violation of this part shall be liable to a fine set and levied ' by the Department of Health and Rehabilitative Services.
8. This fine falls under Subparagraph (4), which states that the Department may set and levy a fine not to exceed $500 for each violation which cannot be classified either as a Class I, II or III violation.
9. The Respondents have submitted a proposed recommended order which includes proposed findings of fact and conclusions of law. The proposed findings and conclusions have been adopted only to the extent that they are expressly set out in the Findings of Fact and Conclusions of Law above. They have been otherwise rejected as contrary to the better weight of the evidence, not supported by the evidence, irrelevant to the issues, or legally erroneous.
RECOMMENDATION
Based on the foregoing, therefore, it is RECOMMENDED:
That Respondent James W. Gillies be reprimanded; that he pay a fine of $50 for each home managed by him, to be suspended upon proof of licensure of the homes; *1110 and that,' as general manager for' all Share-A-Concept homes in Orange County, Mr. Gillies undergo licensure action for each of the facilities currently operated under his supervision.
RECOMMENDED this 14th day of December, 1983, in Tallahassee, Florida.
/s/ Arnold H. Pollock ARNOLD H. POLLOCK
Hearing Officer
Division of Administrative Hearings
Department of Administration 2009 Apalachee Parkway
Tallahassee, Florida 32301 (904) 488-9675
Filed with the Clerk of the Division of Administrative Hearings this 14th day of December, 1983.